IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

UNITED STATES OF AMERICA,

    v.                                                                      Criminal No. 2:20cr044 (DJN)

JULIAN STUART BUTLER,
        Defendant.

**MEMORANDUM OPINION**

This matter comes before the Court on Defendant Julian Stuart Butler's ("Defendant") Motion to Suppress Evidence ("Motion" (ECF No. 31)), moving to suppress all evidence obtained by police against him on or about October 2, 2019. For the reasons set forth below and stated from the bench, Defendant's Motion is hereby DENIED.

### I.    BACKGROUND

**A.**    **Procedural History**

On June 19, 2020, the Government filed an Indictment (ECF No. 1), charging Defendant with two counts: Count One, Felon in Possession of Firearm; and, Count Two, Possession of an Unregistered National Firearms Act Firearm. Specifically, the Government alleges that, on October 2, 2019, Defendant knowingly possessed a Smith & Wesson semi-automatic pistol with an unregistered silencer (the "Firearm"), despite having previously been convicted of a felony.

On November 11, 2020, Defendant filed his Motion to Suppress, seeking to suppress all evidence gathered from him on October 2, 2019. (Mot. at 1.) On November 25, 2020, the Government filed its Response in Opposition to Defendant's Motion to Suppress Evidence ("Govt's Resp." (ECF No. 33)). On December 11, 2020, the Court held an evidentiary hearing on Defendant's Motion, hearing testimony from Officer Maura Flatley ("Officer Flatley") of the

Norfolk Police Department ("NPD") and Kendall Beck ("Beck"), formerly an officer with the NPD. (ECF No. 34; Tr. of Dec. 11, 2020 Hr'g ("Tr.") (ECF No. 36).)[1] The Court also admitted into evidence the footage taken from Officer Flatley's and Beck's body cameras on the night at issue, which the Government had also submitted with its opposition to the Motion. ("Flatley Body Cam" (Govt's Ex. 1; ECF No. 33-1); "Beck Body Cam" (Govt's Ex. 2; ECF No. 33-2).) Defendant offered no evidence. (Tr. 42:20-22.)

Following the presentation of evidence, the Court heard argument on the Motion. (Tr. 44-49.) At the conclusion of argument, the Court denied Defendant's Motion. (Tr. 49:3-8.) The reasons for the denial follow.

**B.     Facts**

On October 2, 2019, at approximately 5:00 a.m., Officers Flatley, Beck and Frear responded to a call reporting a man hunched over in a vehicle in a 7-Eleven parking lot, with the engine running, who had been unresponsive for at least twenty minutes. (Tr. 6:1-7:4; 8:4.) Dispatch listed the issue as "unknown problem/life status questionable." (Tr. 6:17-8.) Fire and paramedical personnel responded approximately three minutes before NPD arrived and spoke with Defendant. (Tr. 7:15-24.) The paramedic told Officer Flatley that Defendant had responded appropriately to all of their questions. (Tr. 9: 23-4.) Defendant had fallen asleep behind the wheel of the car. (Tr. 9:24-5.) The paramedic gave no further indication as to the condition of the driver and told Officer Flatley that he "wasn't going to go digging around." (Tr. 9:24-10:2; Flatley Body Cam 00:41-51.)

After speaking with the paramedic, Officer Flatley approached the vehicle and spoke with Defendant. (Tr. 10:5; Flatley Body Cam 00:55.) She wanted to make her own assessment

---

[1]     The Court finds the testimony from both Officer Flatley and Beck to be credible and supported by their body camera footage.

2

regarding Defendant's condition to drive. (Tr. 18:5-12.) Officer Flatley asked Defendant a series of questions. (Tr. 19:8-20:5; Flatley Body Cam 00:55-01:50.) She asked his destination and where he lived, along with where he worked. (Tr. 19:8-20:5; Flatley Body Cam 00:55-01:50.) Defendant appeared confused and stated that he had fallen asleep before going upstairs to the house. (Tr. 18: 25-26, 27:21-22; Beck Body Cam 00:59-01:06.) Although he did not live in the immediate vicinity of the 7-Eleven, he mentioned his mother being up there. (Tr. 27:24-5.)

Up to this point in the encounter, the officers did not give any commands to Defendant. (Flatley Body Cam 00:51-02:23; Beck Body Cam 00:33-02:02; Tr. 14:13-16.) The body camera footage reveals that Officer Flatley used a calm, conversational tone and did not raise her voice. (Flatley Body Cam 00:55-01:50.) The officers never told Defendant that he could not drive out of the parking lot or exit the vehicle, nor did he ask to do either. Likewise, the officers did not block Defendant from driving away or prevent him from exiting his vehicle. Additionally, they did not tell him that they suspected him of any illegal activity. The officers did not place their hands on Defendant or restrict his movements in any way. At no point during the encounter did any of the officers draw any weapons on Defendant. (Tr. 13:25-14:8.)

When Officer Flatley asked Defendant for his identification card, he began searching in the car for it. (Flatley Body Cam 01:51.) While he searched, Beck shined her flashlight into the car. (Flatley Body Cam 02:04.) As Defendant shifted his weight to look for his identification card in his pockets, both Officer Flatley and Beck saw the grip of the Firearm protruding from between the driver's seat and the center console, with most of the Firearm wedged into this space. (Tr. 11:6-10; 35:13-23; Govt's Ex. 2A.) Upon seeing the Firearm, the officers asked

3

Defendant to place his hands upon the wheel. (Flatley Body Cam 02:23.) Then, they ordered him to step out of the vehicle. (Flatley Body Cam 02:23-:33.)

The officers conducted further investigation into the legality of the Firearm. (Tr. 24:22-25:8.) They could not determine whether the Firearm had been reported stolen, because the serial number was scraped off. (Tr. 37:6.) The officers made a phone call to determine if Defendant had any felony convictions. (Tr. 25:2-11.) Upon learning that he had prior felony convictions, the officers arrested Defendant. (Tr. 26:1-6.)

**C.     Defendant's Motion**

Defendant moved to suppress the Firearm, the body cam footage and all statements that he made during the encounter. He argues that after the paramedics "cleared" him, the officers lacked any basis to converse with him. (Mot. at 2.) Defendant argues that the entire encounter constituted a traffic stop that the officers could not justify with any reasonable suspicion of criminal activity. (Mot. at 3.) In response, the Government argues that the initial encounter was consensual, rendering the Fourth Amendment inapplicable. (Govt's Resp. at 3-7.) Alternatively, the Government claims that the officers had reasonable suspicion to conduct a brief investigatory stop based on the possibility that Defendant had violated laws against driving under the influence. (Govt's Resp. at 7-9.)

## II.     ANALYSIS

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The safeguard of this right comes in the form of the exclusionary rule, which dictates that "evidence obtained in violation of the Fourth Amendment cannot be used in a

criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974). As the Supreme Court has made clear, "the ultimate touchstone of the Fourth Amendment is reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). When law enforcement officials undertake a search or seizure to discover evidence of criminal wrongdoing, "reasonableness generally requires the obtaining of a judicial warrant." *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). If the officials do not obtain a warrant, "a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373, 382 (2014). Here, law enforcement officials failed to obtain a warrant to seize Defendant or search for the Firearm. Consequently, Defendant claims that both seizures violated his Fourth Amendment rights.

However, not all encounters between citizens and law enforcement officers implicate the Fourth Amendment. Indeed, the "Supreme Court has recognized three distinct types of police-citizen encounters: (1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification." *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002) (internal citations omitted). This case spans all three types of encounters, with clear lines demarcating the change from one type to the next. The initial phase of the encounter involved the officers approaching Defendant's vehicle and speaking with him. The next phase of the encounter began when the officers saw the gun and instructed Defendant to place his hands on the steering wheel and continued through the time that the officers investigated the legality of the Firearm. The final phase occurred when the officers arrested Defendant. The Court will address each in turn.

A.  **The Initial Encounter was Consensual.**

Defendant characterizes the initial contact between the officers and him as a traffic stop, while the Government characterizes it as a consensual encounter. Thus, Defendant's Motion rises or falls on the characterization of the officer's initial contact with Defendant. And, because the Court finds as a matter of fact that the initial phase of the encounter was consensual, Defendant's Motion ultimately fails.

"It is axiomatic that police may approach an individual on a public street and ask questions without implicating the Fourth Amendment's protections." *Weaver*, 282 F.3d at 309. "Indeed, officers remain free to seek cooperation from citizens on the street without being called upon to articulate any level of suspicion or justification for their encounters." *United States v. Burton*, 228 F.3d 524, 527 (4th Cir. 2000). However, the citizen encountered in this manner has the "right to ignore his interrogator and walk away." *Terry v. Ohio*, 392 U.S. 1, 33 (1969) (Harlan, J., concurring). Indeed, "[so] long as a person remains at liberty to disregard a police officer's request for information, no constitutional interest is implicated." *United States v. Sullivan*, 138 F.3d 126, 132 (4th Cir. 1998). As the Supreme Court has made clear, "[t]he encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 433 (1991). Not until an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 19 n.16.

  i.  *The Encounter Did Not Constitute a Traffic Stop.*

Defendant's argument rests on his position that, because the officers encountered Defendant in his car, the Court must analyze the initial phase of the encounter through the lens of a traffic stop. However, an officer approaching a parked car and questioning the driver more

6

closely resembles an officer approaching a pedestrian on the sidewalk. *United States v. Lewis*, 606 F.3d 193, 197-98 (4th Cir. 2010); *United States v. Wimer*, 2017 WL 3193660, at *4 (W.D. Va. July 27, 2017) ("For instance, when an officer approaches a parked car and questions the driver, there is no seizure because a citizen in a parked car is akin to a pedestrian."). In *Lewis*, the Fourth Circuit rejected the defendant's argument that the officers seized him as soon as they approached him in his parked car. *Id.* In citing *Weaver* for the proposition that consensual encounters do not implicate the Fourth Amendment, the Fourth Circuit stated that "[t]he officers were thus entitled to approach Lewis, who was sitting in his parked car, late at night." *Id.* at 198. Here, Defendant sat in a parked car when the officers approached him. Although the car was running, it had not moved in at least twenty minutes. Indeed, Defendant had just woken up from sleeping behind the wheel. Therefore, this encounter clearly differs from the police "stopping or diverting an automobile in transit," which "is materially more intrusive than a question put to a passing pedestrian," such that it does not require the reasonable suspicion that must justify a traffic stop. *United States v. Mendenhall*, 446 U.S. 544, 556-57 (1980). Accordingly, the Court will analyze whether the encounter at issue constituted a consensual encounter using the same analysis that it would for an officer approaching a pedestrian on the street rather than that of a traffic stop.

   *ii.*  ***The Officers Did Not Seize Defendant.***

In determining whether an encounter between police and a citizen crosses the line from consensual to an investigatory seizure, courts inquire as to whether "a reasonable person would not feel free to leave or otherwise terminate the encounter." *Weaver*, 282 F.3d at 310. Courts apply an objective test "in view of all of the circumstances surrounding the incident." *United*

*States v. Black*, 707 F.3d 531, 537 (4th Cir. 2013). The Fourth Circuit has identified specific factors that can include:

> (i) the number of police officers present at the scene;
>
> (ii) whether the police officers were in uniform;
>
> (iii) whether the police officers displayed their weapons;
>
> (iv) whether they touched the defendant or made any attempt to physically block his departure or restrain his movement;
>
> (v) the use of language or tone of voice indicating that compliance with the officer's request might be compelled;
>
> (vi) whether the officers informed the defendant that they suspected him of illegal activity rather than treating the encounter as routine in nature; and
>
> (vii) whether, if the officer requested from the defendant . . . some form of official identification, the officer promptly returned it.

*Id.* at 537-38 (citing *Mendenhall*, 446 U.S. at 554).

Applying these factors to the totality of the circumstances here demonstrates that the encounter at issue began as a consensual encounter and remained a consensual encounter up until the time that the officers ordered Defendant to place his hands on the wheel. Although three uniformed officers approached Defendant's vehicle, none of them drew their weapons at any point during the encounter. Only one officer spoke with Defendant, and she did so in a calm tone, using non-threatening language that did not indicate that compliance was compelled.

Moreover, the officers never touched the defendant nor made any attempt to physically block his departure. Indeed, the police officers parked their vehicles in the parking lot next to the 7-Eleven, not behind Defendant's vehicle. During the hearing, Defendant attempted to elicit testimony from Officer Flatley that the ambulance had parked behind Defendant's vehicle, but Officer Flatley could not recall the specific location of the ambulance. (Tr. 16:11-14.) However, based on the Court's review of the body camera footage, the Court finds that the ambulance did

not block Defendant's departure. Nevertheless, any restraint created by a factor independent of the police — such as the ambulance — does not factor into the analysis of whether the officers restrained Defendant's freedom of movement. *See Bostick*, 501 U.S. at 438 (finding the "free to leave" analysis inapplicable, because "Bostick's freedom of movement was restricted by a factor independent of police conduct").

Likewise, the officers never informed Defendant that they suspected him of illegal activity. Indeed, Officer Flatley never asked Defendant if he had consumed any alcoholic beverages or stated that she suspected him of driving under the influence. (Tr. 19:2-4.) Instead, she engaged him in routine conversation about his job, home and well-being. (Tr. 19:12-24; Flatley Body Cam footage 00:55-01:51). None of the conversation would have hinted to the reasonable person that the police suspected him of criminal activity at that point.

Finally, the officers did not retain possession of Defendant's identification card, which could weigh in favor of finding a seizure if they had. Although Officer Flatley asked for Defendant's identification, he had not produced it during this initial phase of the encounter. (Flatley Body Cam 01:51-02:23.) Even if Officer Flatley had retained Defendant's identification, the Fourth Circuit has cautioned against finding that factor dispositive. Indeed, in *Weaver*, the Fourth Circuit found a consensual encounter despite the police officer retaining the citizen's diver's license. 282 F.3d at 312. It so found, because "it does not logically follow that any time an officer retains someone's driver's license that such retention blossoms into an unconstitutional seizure." *Id.* Likewise, the Fourth Circuit has found that a police officer returning a citizen's driver's license weighs against finding a seizure has occurred *after* the return of the license. *See, e.g., United Lattimore*, 87 F.3d 647, 653 (4th Cir. 1996) (en banc) (finding a consensual encounter after return of driver's license); *United States v. Rusher*, 966

9

F.2d 868, 872 (4th Cir. 1992) (same). It follows, then, that if the retention or return of a driver's license cannot convert a consensual encounter into a seizure, then asking for the identification without obtaining it cannot either.

Considering the totality of circumstances, including the lack of coercive actions taken by the officers, the Court finds that a reasonable person in Defendant's shoes would have felt free to leave. Accordingly, the officers did not seize Defendant between the time that they approached the vehicle and the time that they ordered him to place his hands on the steering wheel.

### iii. *The Officers Saw the Firearm in Plain View.*

Nor did the officers search Defendant's car during this time, as they simply examined what Defendant held out in plain view. "The plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997). An officer in a lawful place who shines a flashlight into a car has not conducted a search implicating the Fourth Amendment, as "[t]here is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passerby or diligent police officers." *Texas v. Brown*, 460 U.S. 730, 740 (1983). The Fourth Circuit has recognized that "[t]he Supreme Court has repeatedly refused to recognize a legitimate Fourth Amendment privacy interest in those parts of an automobile that are visible from outside." *United States v. George*, 971 F.2d 1113, 1119 (4th Cir. 1992), *as amended* (Aug. 12, 1992). Moreover, the use "of a flashlight to illuminate the interior of the vehicle is irrelevant for Fourth Amendment purposes." *United States v. Wiley*, 673 F. Supp. 1405, 1407 (E.D. Va. 1987).

This case resembles *Texas v. Brown*, where the Supreme Court found that similar circumstances did not constitute a search. 460 U.S. 730. There, the officer stopped an individual during a routine driver's license checkpoint. *Id.* at 733. Standing alongside the driver's window, the officer asked the driver for the individual's driver's license. *Id.* The officer shined a light into the car and saw the driver pull a green party balloon out of his pocket and let it fall to the seat before opening the glove compartment. *Id.* The officer then shifted his position to obtain a better view of the glove compartment and saw additional suspected drug paraphernalia. *Id.* at 734. Neither peering inside of the driver's car, shining a light to illuminate the car nor shifting positions to obtain a better view of the interior of the car raised the officer's actions to the level of a search. *Id.* at 739. The Supreme Court concluded that "the conduct that enabled [the officer] to observe the interior of [the driver's] car and of his open glove compartment was not a search within the meaning of the Fourth Amendment." *Id.* at 740.

Similarly, here, when the officers noticed the Firearm, they stood in a lawful place — a public parking lot — engaging in a consensual encounter. The fact that they shined a light into the vehicle or may have moved around carries no import. Accordingly, when the officers first saw the Firearm, it resulted from the officers seeing it in plain view rather than through a search. After the officers saw the Firearm, the tenor of the encounter shifted. Although Defendant admitted during the evidentiary hearing that a finding of a consensual encounter at the initial phase would prove fatal to his Motion (Tr. 45:6-9), the Court will nevertheless address why the remainder of the encounter did not violate the Fourth Amendment.

**B.    The Firearm Provided Reasonable Suspicion to Support a *Terry* Stop.**

Upon seeing the Firearm, the officers had the authority to conduct a brief seizure of Defendant. "Under well-established doctrine, a police officer may, consistent with the Fourth

11

Amendment, conduct a brief investigatory stop — known as a *Terry* stop — predicated on reasonable, articulable suspicion that 'criminal activity may be afoot.'" *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020) (quoting *Terry*, 392 U.S. at 30). This reasonable suspicion need not rise to the level of probable cause but "requires at least a minimal level of objective justification for making the stop." *Id.* Courts evaluate the validity of a *Terry* stop using "the totality of the circumstances — the whole picture." *United States v. Sokolow*, 490 U.S. 1, 8 (1989). Importantly, "[f]acts innocent in themselves may together amount to reasonable suspicion; officers are permitted to conduct investigative stops 'based on what they view as suspicious — albeit even legal — activity.'" *Mitchell*, 963 F.3d at 390 (quoting *United States v. Perkins*, 363 F.3d 317, 326 (4th Cir. 2004)).

Here, the Court finds that the officers had reasonable suspicion to conduct a *Terry* stop to determine whether he lawfully possessed the Firearm. The Court recognizes that the mere possession of a firearm in Virginia, on its own, may not justify a *Terry* stop. *See Black*, 707 F.3d at 540 (noting that "where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention"). However, Virginia prohibits carrying a concealed weapon, defined as "observable but is of such deceptive appearance as to disguise the weapon's true nature." Va. Code Ann. § 18.2-308. Indeed, in *United States v. Rumley*, the Fourth Circuit cited Virginia's concealed-carry statute in upholding the seizure of a firearm in plain view in a vehicle, because "the deputy immediately recognized [the firearm] as potential evidence of a crime." 588 F.3d 202, 206 (4th Cir. 2009). Similarly, in *United States v. Davis*, in an unpublished decision, the Fourth Circuit upheld the seizure of a firearm that had the grip protruding from underneath the driver's floor mat, because "the firearm's incriminating character as a concealed weapon was immediately apparent." 428 F. App'x 255, 256 (4th Cir.

2011). In addition to the prohibition on carrying a concealed firearm without a permit, both federal and Virginia state law place other limitations on the possession of a firearm, including by convicted felons. 18 U.S.C. § 922(g); Va. Code Ann. § 18.2-308.2.

Here, Government's Exhibit 2A shows that Defendant concealed the Firearm, at least partially. Defendant had concealed the weapon between the seat and the driver's console, such that it could only be seen after he shifted his weight. And then, only the end of the Firearm became visible while the rest remained hidden. Other facts factor into the reasonable suspicion analysis. Defendant had been slumped over the steering wheel of a running vehicle for at least twenty minutes. Defendant offered incoherent responses and did not seem to understand his location or destination. When combined with his suspected possession of a concealed weapon, the totality of the circumstances demonstrate that the officers had reasonable suspicion that "criminal activity may be afoot," *Sokolow*, 490 U.S. at 7, such that they could investigate the lawfulness of his possession of the Firearm.

Because the officers had reasonable suspicion to conduct a *Terry* stop, they could legally search for and seize the Firearm. An officer who conducts a lawful *Terry* stop "and who has a reasonable suspicion that one of the automobile's occupants is armed may frisk that individual for the officer's protection and safety of everyone on the scene." *United States v. Robinson*, 846 F.3d 694, 696 (4th Cir. 2017) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977)). This stems from the danger that such a weapon poses to those involved in the encounter. *Id.* Moreover, "[i]t is also inconsequential that the passenger may have had a permit to carry the concealed firearm." *Id.* In *Robinson*, the Fourth Circuit recognized the inherently dangerous nature of the presence of a firearm in a stop, justifying the search for weapons. *Id.* at 700. And

as *Terry* instructs, "any weapons seized [pursuant to a *Terry* search] may properly be introduced in evidence against the person from whom they were taken." *Terry*, 392 U.S. 1, 31 (1968).

Here, the officers saw what they reasonably believed to be a firearm in Defendant's vehicle. Accordingly, they reasonably believed him to be armed and thus dangerous. Indeed, the officers' concrete knowledge that Defendant had a firearm goes well beyond the "reasonable suspicion" of a firearm that allows for a frisk. *See Mimms*, 434 U.S. at 107 (permitting a *Terry* frisk based on observation of a large bulge under the defendant's jacket); *Mitchell*, 963 F.3d at 391 (finding that information provided by tipster that the suspect had a firearm justified *Terry* frisk). Therefore, they could seize the Firearm to neutralize the danger posed by an armed individual during the forced encounter.

Additionally, the officers did not err in conducting the investigation into the legality of Defendant's possession of the Firearm. The legally justified *Terry* stop permitted the officers to conduct an investigation into whether Defendant lawfully possessed the Firearm so long as the officers' investigatory actions were "reasonably related in scope to the circumstances that justified the stop." *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992). The police must "diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

Here, the officers' investigatory actions did not exceed the actions that they needed to take to confirm or dispel their suspicions. First, they attempted to "run the firearm to make sure that the firearm [was not] stolen," but could not, because the "serial number was scraped off."[2] (Tr. 25:2-6; 37:6.) Then, Officer Frear called to determine if Defendant had any felony

---

[2] The obliterated serial number in and of itself provided evidence of a crime. *See* 18 U.S.C. § 922(k) (prohibiting the transport of a firearm with a removed serial number); Va. Code Ann. § 18.2-311.1 (prohibiting the removal of a serial number on a firearm).

convictions. (Tr. 25:5-26:3.) No evidence suggests that the officers extended this investigation beyond the length of time that they needed to confirm that he could not lawfully possess the firearm. And, of course, once the officers confirmed that Defendant had a previous felony conviction, they had probable cause to arrest him for violation of the laws prohibiting convicted felons from possessing firearms.[3] *See United States v. Manbeck*, 744 F.2d 360, 376 (4th Cir. 1984) (explaining the probable cause standard as "facts and circumstances within the officer's knowledge [which] would warrant the belief of a prudent person that the arrestee had committed or was committing an offense").

---

[3] Defendant does not challenge the probable cause of the arrest, asserting during the evidentiary hearing that the "motion concentrates on the stop and everything that leads up to the point of them taking him out of the car." (Tr. 25:14-16.)

15

### III. CONCLUSION

In sum, Defendant suffered no Fourth Amendment violation that would warrant suppression of the Firearm that the officers saw in Defendant's vehicle from a lawful vantage point while the officers engaged in a consensual encounter with Defendant. Moreover, upon seeing the Firearm, the officers had the requisite suspicion to temporarily detain Defendant to investigate criminal activity. Therefore, the officers did not violate Defendant's Fourth Amendment rights during the second phase of the encounter. Accordingly, Defendant's Motion to Suppress Evidence (ECF No. 31) is DENIED.

An appropriate order shall issue.

Let the Clerk file this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Dated: December 30, 2020